Good morning. May it please the Court. My name is Josh Oye. I'm here on behalf of the Appellant and Cross-Appellee Krohne Fund, and I'd like to reserve four minutes. This appeal centers on the District Court's interpretation of the Party's Managed Account Agreement, or MAA, as it will appear in the record, regarding a computerized trading of commodity futures and representations made in connection with the trading. The District Court wrongly interpreted the MAA by focusing on the words discretionary and discretion over the words in accordance with. Well, let me ask you how this was. In my reading, this basically was a bench trial, right? Correct. And in my reading of that, what I saw was that both parties told the District Court that the contract is unambiguous, and they said what their interpretation was. And so the District Court basically said, okay, I don't need to look at ambiguity because you're both telling me it's unambiguous, and so what I need to decide, and you would be the plaintiff, right? Correct. So you would have the burden of showing that your interpretation was correct, and the Court said it doesn't say what you say it says. And so, but now, why should we look at, say that it's ambiguous and look beyond that when the parties framed it in a certain way for the District Court? Sure. I don't think you need to get to the ambiguity stage. I think that that's one argument that the Court can take up. However, along the line— Why should we, since the way that you both presented it to the District Court? You both said it's unambiguous. You said this is what it says, and the other side said this is what it says, and the District Court said you're wrong. I would actually agree with you that I think the first position, the more important position for the Court to take, is that it's not ambiguous, and the District Court's interpretation is unreasonable. I think ambiguity comes into the frame, of course, when you have two reasonable interpretations, two plausible interpretations. And I think along the line of what you're saying, I don't think you need to get to the ambiguity analysis. I think that it's the correct— The District Court was just wrong. Yes. I think the District Court's interpretation was unreasonable. It wasn't a plausible interpretation, but yet secondary to Crona funds. So where did the District Court go wrong? They focused on discretion and discretionary rather than in accordance with. So if you look at the MAA— I have it right in front of me. It says that you need to exercise the discretion in accordance with Appendix A. This is exactly what everyone understood was the deal. Everyone from the get-go knew that trades were to be initiated via optimists. Now, the District Court's interpretation by focusing on discretionary functionally eliminates or renders meaningless Appendix A. It renders meaningless the language in accordance with. To the District Court, you just have to have—it's a blanket grant of discretion. And what that does is it undermines the very structure of the agreement. The agreement is written as a very broad body giving discretionary authority. And this is how discretionary trading accounts work versus non-discretionary trading accounts. And then that discretion can be reined in. It typically is. You'll say it's a discretionary account, but you can only trade blue chips or you can only make trades of a certain size. And as Tony Berbilis, who prepared and negotiated the MAA, testified at trial, that Appendix A is the guts of the agreement because you start with a form, a boilerplate body, and then you tailor the discretion in Appendix A. Well, where does it—if you go to Appendix A, where does Appendix A say that they can't exercise manual trades? You're not going to find an express prohibition on manual trades. And this is going to be a fundamental—the fundamental argument or one aspect of it, which is to say, Compidia said, we have a computerized trading system. Corona Fund said, sounds great. Sign me up. There shouldn't be a need to then specify everything that's prohibited. However, Appendix A does get you—it doesn't necessarily say that manual trades are prohibited, but what it does say is that computerized trades are the trades that are authorized. It doesn't authorize any other trading. Listen, Cronin Capital will be trading an $8 million notional Optimus SLR account with a 30% risk budget of $2,400,000. Yep, and Optimus SLR is the software. That's the trading—computerized trading software. And so what you have here is Compidia was formed to market this Optimus system. This Optimus system was a new version of the computerized software that allowed— Well, when it references Optimus SLR, does that mean all the trades are going to be through the computerized program? Yes. It doesn't allow for manual trades? No, no. It would allow for manual trades in the way that, say, if you were delivering a package and you promised to drive it to the location, the recipient of the package would not say that you breached the agreement by getting out of the car and walking up to the door to ring the doorbell. They wouldn't expect you to drive the car through the front window. Does it foreclose the possibility that the account holder could ask for a manual trade? I don't think that it forecloses that possibility, but I think if that were the case, that would require a modification of the agreement, or that would occur probably not under this agreement because the account is in Krona Fund's name, and they've given authority to Compidia to trade the account according to Optimus. Now, Krona, if they wanted to implement a manual trade, they could have done that without talking to Compidia. They could have called up and made the trade themselves. Yeah, somebody else is doing the trading, right? The computerized system is doing the trading, but I'm just saying the fact that you have this agreement for the computerized trading does not mean that Krona could not, absent any interaction with Compidia or otherwise, simply initiate a trade themselves. So when you're talking about in accordance with, you mean you have to look at all of Appendix A. In accordance with Krona capital, we'll be trading an $8 million notional Optimus SLR account, which really means a computerized trading account. Is that right? Absolutely. The key, in other words, all rests because the guidelines are financial, but the key you're relying on is Optimus SLR account is the same thing as software only. Yes, Optimus is the name of the software given to it by its creator or given to it by the principles of Compidia. So it may just look like jargon here, but Optimus is a specific proper noun. It's the name of the software. A term of art, and it's not defined anywhere in the MMA as such, but you're saying that that is the clear meaning based on what? Well, first of all, all the context surrounding the negotiation and the preparation and, frankly, the trading, belies the fact that everyone understood that all trades were to occur via Optimus. When the funds principal, Axel Krona, met with Simonson, the creator of Optimus, they talked about what the benefit was, and it trades the market. It doesn't have the emotional bias of a human, and specifically Optimus was created because it was a version of the software that was previously in use, but this version allowed people to tailor for risk budgets, and that's why Optimus was key because of this 30 percent risk budget. And so when you have this boilerplate body of the MAA, and it says that you exercise discretion in accordance with Appendix A, you have to exercise it in accordance with the statement that you're going to be trading commodities futures via the Optimus account. Then there's emails where Tony Berbilis, who prepared and negotiated it, talks about Krona when he's drafting Appendix A. He says that we have incorporated the risk parameters that we discussed into Appendix A. Please review and make sure it looks good to you. Under the district court's interpretation, that's absolutely not the case. Now, so I can understand your ambiguity fallback, as you were. You say we don't need to go there. I'm familiar with many, many contract cases in California, so I don't know if Montana is the same. In the California rubric, it's pretty easy to put before the trial court or a jury, advisory jury in essence, but in any event, what the parties, as you're saying, understood from all of the surrounding circumstances what these terms meant. Now, in this case, you're saying, well, if you look at the MAA, the management agreement, it says in accordance with the investment guidelines attached here as Appendix A, and we go over and it calls out what you say is the software program. Those aren't, to the judge, clear. I mean unequivocal in the sense of you're having to explain it and you're invoking what we would call in California extrinsic evidence. Now, all of that came in before Judge Haddon, and he said, well, it's not absolutely clear. He apparently didn't believe the explanation of these terms. So how do we frame under Montana law, and what do we rely on to arrive at the conclusion you started out with that it's absolutely clear from the face of the document and the judge's interpretation wasn't plausible? Sure. Under Montana law. Yeah. Under Montana law, we start with the proposition that if we're going to exclude the extrinsic evidence and just look at the face of the document, there are several aspects of the district court's interpretation that render it absurd and render its interpretation unreasonable. The first is the risk budget. It says that there is a 30 percent risk budget. According to the district court's interpretation, that risk budget goes out the window. Compidia could have made a trade that not only lost the two-some million, which eventually became about four, but they could have leveraged Krona Fund's position, approximately five to one. They could have bankrupt the whole fund without Krona ever agreeing to put that money in, without agreeing to the deposit. There could have just been a call made. The second, according to the plain language of the agreement, the district court's interpretation renders meaningless in accordance with an Appendix A. And an interpretation that renders that language meaningless is one that shouldn't be reasonable in the face of another interpretation that does not do that. Krona Fund's interpretation does not render meaningless the word discretionary. In fact, this must be a discretionary account because you can't trade a software system with a nondiscretionary account just by the logistics of it. So whereas Krona Fund's interpretation does not render any word in the document meaningless, the district court completely reads out in accordance with and says that you have to exercise your discretion in accordance or in conformity with essentially nothing. Did you put witnesses on in the Bench trial that talked about what they understood the agreement to say? Yes. Both Axel Krona and Tony Berbilis testified that the agreement limited the discretion to making trades via Optimist. What Tony Berbilis said was something along the lines of what we hit on earlier. The only scenario in which a manual trade might be allowed would be an extraordinary circumstance, probably maintenance-based. Well, is it safe to say that if the district judge thought that your witnesses were correct that you would have won? If he had believed your witnesses? If it would have believed certain aspects of the testimony, then, yeah, I think that it would have ruled in our favor. And if it would have interpreted the contract nonetheless without understanding the plain language of the agreement, then it still could have ruled the way it did. What I find frustrating about the way the district court styled its ruling is that all of its arguments in favor of its interpretation occur in a vacuum. They're not comparative. They don't address what in accordance with means. They don't address why it's unreasonable for Krona Fund to advance its interpretation, why that interpretation doesn't make sense. They just build, they just say it says discretionary, therefore there's discretion. And it doesn't deal with the fact that that discretion is limited and essentially that if you don't limit that discretion, that the district court is adopting an interpretation that could have bankrupt the fund. So if we were to agree with you, what's the result? What are you asking for? I think that the case should be remanded for a new trial. And what takes place at the new trial? Then we have a, well, I think that there should also be rulings about the district court's interpretation, about whether or not it's reasonable to make the statements that it did. But functionally at the new trial. Are you trying to recover for, how do you measure your, are you trying to recover for every manual trade or what? Yes, there is. Because there's some indication that Kronen Fund authorized some of these or requested some of these manual trades. There's. To flatten out at the end of every day. Sure, there's talk of flattening, and I think that that's mostly a red herring. Axel went into this thinking that flattening was something that you would necessarily want to do. He testified at trial that Simonson convinced him that you don't necessarily need to do that. There's also testimony from Simonson that the account flattens automatically. And the e-mails that they're talking about or that opposing counsel represents as giving notice of flattening, one does say manually flattening or overriding the manual. That e-mail is mixed with other representations that, nope, this system is still completely, it's completely systematic. I don't profess to be a discretionary trader. Weren't you trying to say at the trial that, didn't your experts say that your losses were based on if Optimus had been in operation during all of those periods of time as opposed to any manual trades, the result would have been X, and instead the result was Y, and then you subtracted the two. Isn't that how you calculated your damages? That was one theory of damages. I believe it was predicated on exhibits that were refused. The primary mode of damages is the account lost this amount of money. So you're not looking at a comparative scenario of it would have made this much had the system traded. Right now we're looking at we lost this much based on manual trades. There's a trade log that shows each trade that was made and how it was profitable. And so, for example, there's a- But then you're kind of comparing that to what, supposedly what Optimus would have said during that period of time. But I think that there was some, there was a question raised whether the Optimus model of what would have happened is really accurate too, right? No, the trade log is accurate. There was a question raised as to whether a back test was accurate. But how could you win and say every manual trade, so every manual trade that we lost on, we get that money back? That's your damages? You would look to the trade log, and you would see that there was a manual trade initiated at the discretion of a principal of Capitia, and that trade lost $250,000, $500,000. I mean, these are also trades that are well out of the ordinary. But what if it hadn't been a manual trade, which you're saying there shouldn't have been anything? There should have been no manual trades. Don't you have to see what, what if there had been a loss on that? Then you still get the windfall? That's something to consider, but it's not an issue. I'm not sure why it would be a windfall if you signed up for a software automatic trade. You could lose or win on that. So you're not claiming, I mean, that's not offsetting. You're saying when they departed from that, that's the loss you encountered, and it's, you know, presumably Optima wouldn't have made that trade. Correct. Presumably, Optimus would not have made that trade. And in any event, what we bought, the benefit of the bargain, was a computerized trading system not subject to human emotion and bias. When that element gets introduced and you lose six figures of money, that's damages. I think I'll see the remainder of my time. Let's hear from the other side. Good morning. Good morning. My name is Tom Singer. I represent the defendants, Stu Simonson and Capidia, LLC. Could you speak up a bit? I certainly can, Your Honor. I apologize. I've got hearing aids that pick up everything but not low volume. My court reporters often accuse me of mumbling, so I don't mind the correction at all. The managed account agreement is not as complicated as I think Mr. Oye wants to portray it. It talks about discretion. It talks about guidelines. It also talks about Optimus SLR. But the whole package, if you look at the brochure, and I understand that's a document, but this whole thing is a systematic algorithm-based system. How many trades out of the trading history were manual? I get the understanding that 60% of the trades were manual. That number is somewhat arbitrary, but I'm not going to quibble about it. That just is not flat-out consistent. I went through that brochure in detail, and, boy, it sure talks about automated software. You've got a name for the software. You've got a name for this particular program. That's what differentiates. That's the competitive advantage. Boy, if I were investing in this sucker, I would have expected systematic trading. You know, my client expected systematic trading too, and he was very disappointed that the Krona Fund decided not to do that. How did they decide? Well, this system includes a couple of components, and the component that you're talking about is this automated training component, the algorithmic system that my client designed, Stuart Simonson designed, and marketed it as Zyniquant. That's a different entity. There's also a piece of it which is the monitors, the computers, where you can actually watch the trading that's going on. You as the client. Client. It's on the desktop. It's a Windows-based system. You can watch it the way you can watch YouTube videos. Yes. Or you can watch the sticker on it. Exactly. And that system, the one over here, the monitoring system, actually gives the client complete control. Yes. So just to cut this short, are you saying that all these manual trades were committed by the client? Mr. Krona did not initiate any trades at all in this. He interacted with Tony Berbilis. Yes. And at least my client's understanding. Remember, Stuart Simonson is the guy who wrote this software. He created the algorithms. Yes, but Berbilis signed up for it. According to your promo materials, these guys were joined at the hip. Absolutely. And the testimony at trial was disputed about this. So when Mr. Oyes says everybody understood, that's not necessarily something we can agree on. The judge had to figure out who understood what. But Tony Berbilis had interactions, most of the interactions, with Mr. Krona. The interactions between my clients, Stuart Simonson and Mr. Krona, there's numerous e-mails in which my client says to Mr. Krona, if you weren't going flat every night, if you didn't insist on that, the program would operate differently. Now, those aren't the exact words. Now, wait a minute. Yeah. Who instructed and implemented going flat? Well, my client's understanding, Stuart Simonson's understanding, was that that's what Axel Krona told Tony Berbilis. Now, that's not what they said at trial. They said something quite different. They who? Tony Berbilis and Axel Krona. Yeah. Well, so Berbilis. So your guy Simonson is being set up by his partner? Yes. That's part of the reason that we tried to assert a counterclaim that we weren't allowed to pursue. There's evidence that in September. That's not what the judge relied on, though. What the judge relied on was he said the burden was on the plaintiff, so it was unambiguous, clear on the face, and they didn't do that, and they hadn't argued ambiguity. Neither side had. So if we look at the documentation, which I've done, I still have trouble. No, you're saying, well, the client, there's a fact dispute as to who authorized these trades. That's not what the judge didn't say. Well, there's some conspiracy or the client was overriding. It said it gave the fund, not the fund, the software supervisors the authority under this, in accordance with the investment guidelines, a discretion without regard to the client to override and go flat or whatever. That does not strike me as a reasonable interpretation of this structure because it's totally inconsistent with the brochure claiming that was the whole hallmark of this company. That's what gave it a competitive advantage. Your Honor, if Axel Krona had wanted the agreement to say only algorithmic trading, he could have negotiated that term, or if he had said no manual trading. What does it mean in the appendix? Kronon Fund will be trading an $8 million notional Optimus SLR account. Why does an Optimus SLR account mean the computerized trading? It does. It does. But here's the piece. It struck me as I was listening to you. It struck me that what you were saying about going flat and all of that, that that's really kind of a separate defense to the amount of damages that he's seeking. Because it's like, sure, what you're saying is, and I may be misunderstanding you, but yes, this was a computerized trading program. We did that. That's what it provided for. But they instructed us to trade manually. Your Honor, the agreement said that we will make this available. It was available. It was available. The systems in front of him, when that system goes out of sync, goes flat, is no longer trading algorithmically, the screen, uncontested testimony, the screen turns yellow and says, you're out of sync. And so what? And then it's got a button, and you can touch that button, and that's how you sync it again. So Axel Krohne. Who's supposed to touch the button? I'm sorry? Who's supposed to touch the button? Axel Krohne could touch it. Tony Berbilis could touch it. They were the ones watching the count. Stu Simonson wasn't. Berbilis is with the company, right? Right. Okay. And Krohne is the client. What I'm saying here, Your Honor, is. The obligation to this contract, it says, will be traded discretionary in accordance with guidelines, which is this optimist. Which is the software. What Mr. Oye wants to do is ignore the words discretion and guidelines, because guidelines aren't mandatory. Guidelines are this. And all that managed account agreement does is say, we will provide this optimist system to you. And it was provided, exactly like the agreement said. The agreement was fulfilled. Now, Mr. Krohne had the option of using the system or not. He claims that that's what he wanted, but he also testified repeatedly that there was never any representation made to him at any time that there would be no manual trading in this. The judge questioned him repeatedly on that. No representation was made. He never asked the question, will all trades be made algorithmically? And he assumed, this is his testimony, he assumed that there would be manual trades. He understood that that was necessary to operate these systems. Now, he didn't expect, I believe. He testified, certainly, that he wouldn't have, he didn't expect a number of manual trades. But my client didn't expect a number of manual trades either. And once you go flat at night, re-syncing this system in the morning is a complicated process. Why do they go flat at night? Well, there's two reasons for going flat at night. One is the system frequently does it on its own. Mr. Oye referenced that. So a lot of times it doesn't make any difference. But if you want to go flat at night, in order to avoid a perceived risk of a market shift during the night, you go flat and then you have to re-sync it in the morning. My client's understanding, he didn't have direct knowledge because he wasn't part of the conversations, but he was told by Tony Berbilis that Axel Krohne was uncomfortable staying in the system overnight. He didn't like the overnight risk. And consistent with that, there are emails and there are a lot of nights when the system is put flat manually by Tony Berbilis. Now, Mr. Oye will probably disagree with that because one of the hotly contested issues at trial was who was doing these. There were two user numbers, 4 and 6. Those were the two user numbers. The system is no longer operating, so we can't go in and figure out who it is that was using user numbers 4 and 6 based on any scientific or computer logs. But the testimony at trial was that Stuart Simonson used user number 4 and Tony Berbilis used number 6. Tony Berbilis claimed that both he and Stuart Simonson used number 6. We argued that that's an absurd notion that one person could log off, that Stuart Simonson could sneak in as number 6 and then log back out and Tony would log on as 6 and make a trade and then go back and forth. That's not how it worked and there's no evidence that it did. Can I get the, you keep emphasizing Simonson, who's your client. Correct. Okay, but the defendants are Simonson and Cappadidia Capital. You don't represent? I do represent Cappadia Capital, yes. Cappadia. Okay, so Berlinson, Berbilis, I'm sorry, he was also part of Cappadia. Correct. I'm confused. This is a contract between fund and the Cappadia. Correct. Okay, and the principals are Simonson and Berbilis. So if Berbilis is doing these trades or Simonson, what difference does it make as far as Cappadia's liability here and breach of contract? I'm not arguing that it makes a difference about whether it was Berbilis or Simonson. The reason it makes a difference is in terms of the credibility of those witnesses, Your Honor. That's getting in the way. See, that's why this case is confusing. You know, you invoke on the evidence, and I'm trying to look at the structure of the agreement. And the flat-out rationale of this whole device is that it makes algorithmic trading. It removes the personal. It doesn't eliminate it, but that's the whole purpose of it. Now, you're saying, well, it was available. Well, that's inconsistent with the directions to the Cappadia, which is you've got to manage it in accordance with the investment guidelines in Appendix A, and that includes the software as well as he mentioned the 30% risk budget. Yes. So whatever Axel was doing, as Judge Paya says, that may be causation on losses. But in terms of Cappadia's obligations in managing it, it seems to me if we're looking at the face of the document, I don't see how. Can I remind you that Appendix A starts out by saying Crona Fund will be trading. It doesn't say Cappadia will operate Optimus. It says Crona Fund will be. Crona Fund had access to the Optimus SLR. That's what that appendix provides. Okay. So it says Crona Capital will be trading on Optimus. And Crona Fund traded using Optimus. It got exactly what it bargained for. It's as if it bargained to lease a car. It had the car available. Then who had control of Optimus SLR? Well, Optimus SLR is a set of strategies that are operated algorithmically. Yes. My client defined those strategies and maintained those strategies and kept them available. Yes. But who was implementing those strategies? Who was running the software? Was Crona Fund running the software? The question is sort of like asking who's making the trade when you buy a stock. I'm the one, if I'm the customer. So if I'm Crona. Yes. And I'm giving you – what is it? Would I have to put up $2.4 million to trade up to $8? Right. Okay. So I give $2.4 and I say I want this traded pursuant to the strategies and tactics embedded in an Optimus SLR that you've developed. Right. Okay. Who's actually – am I – When that money – Am I hitting the button to run the SLR Optimus account or are you or Judge Fischer, somebody else? Well, the money goes in and as long as nobody pushes the button that says go flat, it runs. That money's in there. It's operated according to – And it's running against the trading market. It's buying and selling S&P minis the way it's supposed to. Right. Off the market. The only way that changes is somebody pushes the button. And who – under this agreement, who has the authority to push that button? Well, fascinating question. And the answer is the client directs that. On individual trades? On the system. You either – you can say I want to overwrite it. Again, the two systems, the algorithmic system over here and the monitoring system over here. I'm sitting at my desk or I'm flying away and I don't have access to it and I don't do anything. I just sit there and I'm monitoring it. I'm looking at what's going on. As you say, absent any intervention by Krono Fund, it will automatically trade on the software. Yes. Unless something goes wrong. Right. Yes. But okay. And so as far as Krono Fund's claim is, my understanding is somebody at Kapitia entered manual, pushed the button or did something, not Krono Fund. And that's what they're seeking the losses for. That's the allegation. That doesn't sound – so it seems to me as a matter of contract, you've affirmed their reading, that basically what they signed up for was an automated system that unless they intervene, it would by default do all the trading of their $8 million notional account. But their reading and the way you're reading it would suggest that even if they said stop trading, it still has to trade that way. No, no. No, it does not. Well, that's the – No, it doesn't. It's available. Why – where does it say available in the agreement? With all due respect, Your Honor, it's not there. That's what you said. I'm using your words, counsel. You said that's what they got. It was available to them. And it was available to them as a tool. That's exactly right. And the tool was set on default automatic to make automatic trades. Now, yes, he could have intervened. Where in the agreement does it give him authority to intervene? It doesn't say that. When you say give who authority, you mean – Krono. Where does it say Krono can opt out of it? The agreement doesn't say that either. But you're saying – but now you're telling me that that's in the agreement. No, no. That's not in the agreement. I'm still – Judge Fischer picked up what I had asked. You were trying to answer my question about who had the authority to push the button. Ultimately, the authority rests with the client. So the client – Well, then, who can – see, I just don't – maybe it's because I'm showing my ignorance about how these trading markets work. But if I – was the software downloaded onto Cronin's computers? The monitoring software was, not the algorithms. But the algorithm software is on Kapitia's computers. It's actually on Zynequan's computers. On Zynequan's computers, right? Yes. So somebody at Zynequan also had control. Right, which was not exercised, at least to my client's understanding, was never exercised unless Mr. Cronin indicated that that was his desire. Okay. The client – Let me ask you, in this case, did the district court judge make that finding? The district court did not reach that finding because the district court found the contract unambiguous. And I think the – But he – didn't he essentially find that it gave your clients the authority to make manual trades? Well, I don't know that I would characterize it that way. He said it did not mandate the use of the algorithmic system that it gave discretion over here. To Kapitia. Yes. Yes. I know it's painful to say that, but yes. No, no, I agree with you, yeah. I mean, the judge did not reach that point. Yes. And so did the judge need to reach that point? I'm still back to where I was after I – now that I kind of – I mean, I tried my best to understand how all this fits together, but I'm still having concerns that really what you're talking about is the – who really – it's that Cronin Fund is actually responsible for the manual trades. Well, Your Honor, in trading, the client always has the ultimate responsibility. Well, but that the manual trades here were done by the client. That's what you're saying. Or at the client's direction. Right. But you're also – as I understand what you're also saying is that the Optimist SLR account was an algorithmic systemic trading program. Yes, my client designed the most incredible algorithmic trading program anyone could imagine and made it available. But the way it was presented to the district court is the appellant – or what – well, Cronin will just say because he censors cross appeals, but that Cronin said that the agreement only allows for Optimist. That there would be nothing else. That's his position at trial, yes. And you said it's unambiguous that it allowed for other trading. Yeah, that was one of the arguments we made, yes. All right. And Judge Haddon said it's not unambiguous that only Optimist trades. Yeah, he agreed with our argument on that point, correct. Well, but you were saying that – but I don't know that he – well, that what they said was not unambiguous. But you were saying it was – but you also said it was unambiguous another way, right? Yeah. Right. Neither party argued ambiguity. The judge pointed that out. And so, yeah, we both thought it was clear for our way. That's true. And he basically said, but I only have to decide what Cronin says. If it's unambiguous in what Cronin says, then Cronin wins. Correct. Okay. My time is well over. Any other questions? No. Thank you, Your Honor. Thank you. Just a couple things. In closing, Your Honors, I think this appeal can be decided without resort to the ambiguity argument. The district court's interpretation is unreasonable. As counsel said up here, it was the client's authority – As soon as you start saying unreasonable, that suggests there's another reasonable interpretation. The reasonable interpretation is – And that suggests it's ambiguous. No. The only reasonable interpretation is Cronin funds. That's why it's unambiguous, and the district court adopted an unreasonable interpretation. Not a plausible, yet not preferable to Cronin funds, which might be a situation in ambiguity. But if there's not two reasonable interpretations to begin with, then you don't get into ambiguity. And I maintain that that can be the level at which this appeal is decided. As opposing counsel stood and said just a second ago, it was the client's authority to push the button to have manual trades. He also said that everyone has agreed that Cronin fund did not initiate any manual trades. But nonetheless, manual trading took place. Sixty percent of the trades in the account were manual. I didn't hear him say that everyone agrees that Cronin didn't initiate any manual trades. Did he say that? I believe he said we are all agreed that the manual trades were by user four and six. You could initiate a trade from your viewer, and that would mean that that would be actual Cronin's login. No trades. And there is trial testimony on this as well. But he also said that there was communication with Burbillis approving of Burbillis pushing the button. To flatten it out. Sure. And there was conflicting trial testimony over that. And ultimately, I think there are two points that are critical. So that everyone doesn't agree on that. On that aspect, I guess not. And I think the two points that are critical there is that's a secondary issue to the contract interpretation. The judge decided the gateway issue that just said Kapitia can make manual trades. And when we're talking about who authorized Burbillis, we didn't even have a chance to know what the judge's findings are on that because they decided the gateway issue. The second on that issue is that we're talking about flattening at the end of day when we're talking about the alleged instruction. Now, on the issue of flattening, there is testimony that the jargon involved was confusing for all. There are e-mails from Simonson indicating that, in fact, the flattening was automated, and there was no procedure for manual flattening. There is e-mails to him indicating when it flattens, that's happening automatically, and it almost always is going to do it that way. And, frankly, that's not the damages that we're talking about, which one of your honors brought up before. I mean, there are trades where we lose six figures in the middle of the day. The flattening at night, when you look at the trade log, is not where the damages are in this case. But, functionally, there's one interpretation that reads out Appendix A and in accordance with, and there's one interpretation that maintains the integrity of that language and the word discretionary because a non-discretionary account can't trade the Optimist system. The logistics wouldn't work. With a non-discretionary account, the owner has to give individual permission for every trade. The benefit of a computerized program is that it's making split-second decisions, and if you have to call and get Axel's approval for every trade that the computer wants to initiate, you've already lost the edge. So that's why the word discretionary appears in the MAA. But, nonetheless, that discretion is limited. It's limited to the Appendix A. Okay. Thank you. Thank you, Counsel. Thank you, Counsel. It was an interesting case. Yeah. It was an enjoyable one, actually. The matter is submitted.
judges: Fisher, Paez, Callahan